# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark Tymes,                 :
            Petitioner     :
                          :
          v.                :    No. 464 C.D. 2024
                          :
City of Philadelphia (Workers'    :
Compensation Appeal Board),     :
            Respondent   :    Submitted: December 9, 2024


BEFORE:    HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE MATTHEW S. WOLF, Judge
                 HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                                     FILED: January 29, 2025

      Mark Tymes (Claimant) petitions this Court for review of the April 5, 2024 order of the Workers' Compensation Appeal Board (Board) affirming the decision of a workers' compensation judge (WCJ) that denied Claimant's petitions for reinstatement of workers' compensation benefits (Reinstatement Petition) and for penalties (Penalty Petition) (collectively, Petitions) against the City of Philadelphia (Employer).  Claimant maintains that Employer's continued payment of Claimant's regular salary while he was out of work constituted an acceptance of liability for Claimant's injury and that Employer violated the Workers' Compensation Act (Act)[1] by ceasing that payment and by failing to issue a timely Notice of Compensation Denial (NCD).  Finding no merit to Claimant's challenges, we affirm the Board.

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.1; 2501–2710.

## I. Background

Claimant was working for Employer as a police officer when, in October 2020, he became ill and was diagnosed with COVID-19. Certified Record (C.R.), Item No. 7, WCJ Decision, Finding of Fact (F.F.) No. 1(b.). After a one-week absence from work, Claimant returned on October 13, 2020, but was hospitalized on the same day with lightheadedness. *Id.*, F.F. No. 1(c.). Claimant has not worked since that day. *Id.*, F.F. No. 1(d.). However, Claimant continued to receive regular paychecks and accrue sick and vacation time until March 5, 2022. *Id.*, F.F. No. 1(f.). Employer issued an Notice of Compensation Denial (NCD) on July 20, 2022, in which it indicated an injury date of October 13, 2020, but asserted that Claimant did not suffer a work-related injury. *See* C.R., Item No. 24.

On August 16, 2022, Claimant filed the Petitions alleging that Employer "unilaterally terminated benefits" after accepting liability for a work-related injury by continuing to pay his regular salary, which Claimant referred to as "payment of wages in lieu of benefits."[2] C.R., Item Nos. 3-4. In support of the Petitions, Claimant testified at a January 23, 2023 deposition and at a February 23, 2023 videoconference hearing before WCJ Holly San Angelo. In its defense, Employer offered the August 15, 2022 deposition testimony of Barry Scott, its Deputy Finance Director for Risk Management and its Risk Manager, and the August 25, 2022 deposition testimony of Lieutenant Donald Lowenthal, Infection Control Officer of the Philadelphia Police Department (PPD).

---

[2] Payments in lieu of compensation are "any voluntary or informal compensation, apart from the Act, paid with the intent to compensate for a work-related injury." *Kelly v. Workmen's Comp. Appeal Bd. (DePalma Roofing)*, 669 A.2d 1023, 1026 (Pa. Cmwlth. 1995).

## A. Claimant's Evidence

At his deposition, Claimant stated that he was 52 years old and a 33-year veteran of the PPD. C.R., Item No. 15, Claimant Dep. at 5-6. Sometime before October 2020, Claimant had been assigned to the PPD's airport unit, where he patrolled the airport's terminals, roads, and parking garages. *Id.* at 6. After the onset of the COVID-19 pandemic, Claimant was regularly brought into contact with members of the public and fellow officers who did not wear face masks. *Id.* Claimant fell ill on October 5, 2020, and received sick pay while absent from work from that date until October 12, 2020. *Id.* at 8.

Claimant returned on the morning of October 13, 2020, but, while putting on his uniform in the station locker room, began to feel "really, really lightheaded." *Id.* at 9. Medics transported Claimant to the Hospital of the University of Pennsylvania, where, to Claimant's recollection, he was diagnosed with COVID-19. *Id.* at 12. From the hospital, Claimant notified his supervisor of his belief that he was infected with COVID-19 in the locker room. *Id.* at 10. Claimant recalled that he was under quarantine while hospitalized from October 13, 2020, until October 17, 2020, and, following a brief return home, was kept in the hospital's intensive care unit (ICU) until October 28, 2020. *Id.* at 14-15. In the ICU, Claimant recalled, he was "on oxygen around the clock" due to his breathing difficulties. *Id.* at 15. At the time of his deposition testimony, Claimant continued to receive treatment from his primary care physician and a pulmonologist. *Id.* at 12. Claimant had not returned to work at the time of his deposition testimony due to the persistence of certain symptoms, which he described as "shortness of breath and a brain fog." *Id.* at 11.

On cross-examination, Claimant acknowledged that he did not recall responding to any calls at work involving COVID-19 medical emergencies, nor

could he recall any unit colleagues testing positive for COVID-19 in the two weeks before his illness. *Id.* at 22-23. Claimant also acknowledged never filling out an injury or accident report following his hospitalization, despite being aware that Employer requires such a report in cases of work injury or illness. *Id.* at 32-33.

At the February 23, 2023 videoconference hearing, Claimant testified that he continued to experience the complained-of symptoms and had thus not returned to work. C.R., Item No. 13, Hr'g Tr. at 14. Claimant also acknowledged that he continued to receive his regular pay between October 2020 and March 2022, and that Employer's term for that type of payment was "e-time." *Id.* at 16. However, Claimant testified that he did not understand the rationale behind Employer's payment of e-time; the "only thing [he] knew," he explained, was that "every two weeks [he] was getting paid." *Id.* at 17. In March 2022, a PPD lieutenant informed Claimant that he would need to bring an updated sick note to PPD headquarters in order to remain off work. *Id.* at 18. When Claimant produced the requested sick note, he was told that he would need to begin using his accrued sick pay if he remained out of work. *Id.* at 18-19. Claimant acknowledged that, following his transition from e-time pay to sick pay, he did not fill out an injury report or a request for injured-on-duty (IOD) benefits. *Id.* at 21. At the time of his hearing testimony, Claimant was still receiving his regular sick pay via direct deposit. *Id.* at 20.

### B. Employer's Evidence

At his deposition, Mr. Scott testified that he has served as Employer's Deputy Finance Director in its Risk Management Department and as Employer's Risk Manager since 2003. C.R., Item No. 20, Scott Dep. at 6. Mr. Scott explained that Risk Management administers several different types of disability benefits for PPD

officers, including workers' compensation, Heart and Lung benefits,[3] and benefits pursuant to the COVID-19 Enforcement Officer Disability Benefits Act.[4]  *Id.* at 7. When PPD officers believe that they have sustained a work injury, Mr. Scott explained, they are instructed to fill out a City of Philadelphia Accident, Injury & Illness Report, commonly referred to as a COPA II.  *Id.* at 7-8.  Mr. Scott explained that the report is necessary so that the relevant management officials may conduct an investigation.  *Id.* at 8.  The claim is also forwarded to PMA Management Corporation, Employer's third-party claims administrator, which performs its own investigation.  *Id.*  Following the investigations, the employee is to receive a notification letter explaining the acceptance or denial of the claim, and the benefit that he or she is to receive.  *Id.*

Mr. Scott recalled that, following a stay-at-home order issued on March 23, 2020, Risk Management was tasked with "addressing how to protect City workers from contracting COVID[-19] as well as ways to minimize the spread in the community as it impacted City operations."  *Id.* at 10.  Meanwhile, Mr. Scott explained, Employer was receiving an increasing number of claims by employees of workplace exposure, including PPD officers.  *Id.* at 11-12.  The Risk Management Department decided that the fairest solution for such claims until they were evaluated was to continue the PPD officers' pay through e-time status.  *Id.* at 13.

---

[3] The Heart and Lung Act provides public safety officers with their full salary while they recover from temporary, work-related ailments.  Act of June 28, 1935, P.L. 477, *as amended*, 53 P.S. §§ 637-638.

[4] Act of April 29, 2020, P.L. 118, No. 17, § 1, effective April 29, 2020 (Act 17).  In relevant part, now codified at 35 Pa.C.S. § 57A02(a)-(b), Act 17 provides that a person who is eligible for Heart and Lung Act benefits and who is temporarily incapacitated from performing his duties following a COVID-19 diagnosis may receive up to 60 days of Heart and Lung Act benefits.

Mr. Scott explained that e-time is not sick pay or personal time off, but "sort of an administrative timekeeping category," which is used to continue paying salaries and avoid the risk of unfairly penalizing workers. *Id.* at 13-14. PPD officers did not need to establish illness to be eligible for e-time pay, and it was awarded without a determination that the officer was infected with COVID-19 through work. *Id.* at 13.

In January 2022, Employer became aware that several PPD officers, claiming disability due to long-term COVID-19 symptoms, were still out of work and receiving e-time pay. *Id.* at 15-16. Employer decided to transition the officers from e-time to Act 17 benefits, which provided them with an additional 60 days of pay. *Id.* at 16. Once their Act 17 benefits ran out, Mr. Scott explained, the officers would be permitted to use their accrued sick time if they did not return to work. *Id.* at 17. Mr. Scott testified that, before the filing of the Petitions, Claimant had never made a claim for IOD benefits or other disability benefits. *Id.*

On cross-examination, Mr. Scott acknowledged that he is not a PPD employee and that, while the Risk Management Department issues recommendations to the PPD and other municipal agencies, it has no "managerial authority" to control those agencies' actions. *Id.* at 21. Mr. Scott also acknowledged that the Risk Management Department was not, in 2020 or 2021, keeping a precise record of how many PPD officers were infected with COVID-19, nor did it perform "contact-tracing" or other investigations to pinpoint the sources of those infections. *Id.* 25-26. While asserting that the Risk Management Department played no role in the determination, Mr. Scott also acknowledged that eight PPD officers were determined to have died from COVID-19 at the time of his testimony, and that all eight deaths were designated as in the line of duty. *Id.* at 37.

6

At his deposition, Lieutenant Lowenthal testified that he was serving as the PPD's Infection Control Officer since 2007. C.R., Item No. 21, Lowenthal Dep. at 7. Before 2020, Lieutenant Lowenthal explained that he was normally tasked with supervising the care and testing of PPD officers who were "bitten, stabbed with needles, exposed to blood as a result of trauma, [and had] gunshot wounds, [or who] may be exposed [to] fluids like helping people deliver children, [and] things of that nature." *Id.* at 9. Lieutenant Lowenthal recalled that his role was modified in March 2020 so that he could work exclusively on the PPD's management of the COVID-19 pandemic. *Id.* at 10. In that capacity, Lieutenant Lowenthal became responsible for communication with PPD officers who may have been infected with COVID-19, including directing them to testing centers, how to look for illness symptoms, and what precautions they should take during and after periods of quarantine. *Id.* at 11. Lieutenant Lowenthal also fielded calls from PPD supervisors seeking guidance on how to handle the work duties of officers who were or who may have been exposed to COVID-19. *Id.* at 18. When advising supervisors on how to adjust the pay of officers who were absent during that period, Lieutenant Lowenthal recommended following "the current policy at the time", *i.e.*, that the officers be given e-time pay. *Id.* at 20. However, Lieutenant Lowenthal made that recommendation without regard to where the officers may have been infected with COVID-19. *Id.* Lieutenant Lowenthal explained that the purpose of the policy at the time was "to keep people from coming to work sick" and "infect[ing] their coworkers." *Id.* at 14.

### C. The WCJ's Decision

In a July 13, 2023 decision, WCJ San Angelo determined that Claimant failed to meet his burden of proof on the Reinstatement and Penalty Petitions and denied both. WCJ Decision, Conclusion of Law (C.L.) Nos. 3-4. In WCJ San Angelo's

7

view, the "sole issue to be decided" was whether the payment of e-time constituted wages in lieu of compensation that should be "reinstated." *Id.*, F.F. No. 9. Accordingly, WCJ San Angelo deemed testimony regarding other issues, such as the PPD's safety policies and Claimant's opinion as to the source of his COVID-19 infection, "not germane" to her inquiry. *Id.* WCJ San Angelo credited Claimant's testimony, finding that "he did not know the purpose of [e]-time," and only knew that he continued to be paid by Employer during his absence for an unknown reason. *Id.*, F.F. No. 10. Claimant offered no testimony that he believed e-time to be compensation "for a work-related injury, nor did he present any testimony that such payments lulled him into a false sense of security that his alleged work-related claim was being accepted," WCJ San Angelo noted. *Id.* WCJ San Angelo also examined daily activity reports (DARs) that recorded Claimant's pay status, and noted that the DARs gave no indication that the e-time pay was contingent on Claimant's illness or disability, or that e-time pay was a form of workers' compensation benefits. *Id.*, F.F. No. 11.

WCJ San Angelo also found the testimony by both of Employer's fact witnesses credible. Mr. Scott credibly testified, she noted, that e-time was "an administrative time-keeping tool utilized during the first global pandemic Employer was faced with as a way to keep people on payroll who contracted COVID[-19] and were missing time from work." *Id.*, F.F. No. 12. WCJ San Angelo found that e-time was "not a disability benefit," because it was not administered by Employer's third-party claims administrator, and because it was not funded through any federal legislation designed to provide sick leave for disabled officers. *Id.* Lieutenant Lowenthal also testified credibly that the recommendation to provide out-of-work officers with e-time during the COVID-19 pandemic was consistent with the

8

informal PPD policies then in place to prevent the spread of the virus. *Id.*, F.F. No. 13.

Claimant appealed to the Board, which affirmed WCJ San Angelo. *See* C.R., Item No. 10. This appeal followed.[5]

## II. Issues

On appeal, Claimant maintains that the WCJ "misapplied pertinent caselaw in this matter, failed to address facts critical to the pending Petitions, and issued findings that are not based upon competent evidence." Claimant's Br. at 14. Claimant argues that the WCJ committed further legal error by failing to "reinstate" his benefits, by disregarding the Act's humanitarian purposes, and by failing to acknowledge Employer's violations of the Act.

## III. Discussion

### A. Evidentiary Burden

"Payments in lieu of compensation," this Court has stated, are "any voluntary and informal compensation, apart from the Act, paid with the intent to compensate for a work-related injury." *Kelly v. Workmen's Comp. Appeal Bd. (DePalma Roofing)*, 669 A.2d 1023, 1026 (Pa. Cmwlth. 1995). An employer who makes payments to an employee in lieu of compensation is estopped from denying compensability for that injury unless it files an NCD denying liability. *Id.* When a disabled employee continues to be paid "in relief of the employee's capacity to labor," and an employer has knowledge that the employee sustained a work injury,

---

[5] Our standard of review is limited to determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated. *Lehigh Specialty Melting, Inc. v. Workers' Comp. Appeal Bd. (Bosco)*, 260 A.3d 1053, 1058 n.3 (Pa. Cmwlth. 2021).

a presumption arises that the payments are intended to compensate the employee for that injury. *NUS Corp. v. Workmen's Comp. Appeal Bd. (Garrison)*, 547 A.2d 806, 810 (Pa. Cmwlth. 1988) No such presumption arises, however, when payments made "pursuant to a plan for *non-occupational injury or illness* which is identified as not being [workers'] compensation." *Id.* (citing Section 315 of the Act, 77 P.S. § 602)[6] (emphasis in original). In determining whether payments were in lieu of workers' compensation, the "critical legal element" is the employer's "*intent* in making those payments." *Findlay Twp. v. Workers' Comp. Appeal Bd. (Phillis)*, 996 A.2d 1111, 1118 (Pa. Cmwlth. 2010) (emphasis in original).

Here, Claimant seeks what he purports to be a reinstatement of his wage loss benefits through the Reinstatement Petition. When seeking reinstatement of benefits, a claimant carries the burden of proving that he is once again disabled because a work injury has "increased or recurred." *Bufford v. Workers' Comp. Appeal Bd. (North Am. Telecomm.)*, 2 A.3d 548, 557 (Pa. Cmwlth. 2010). Where the causal relationship between the work incident and disability is not obvious, unequivocal medical evidence is necessary to establish it. *Jeannette Dist. Mem'l Hosp. v. Workmen's Comp. Appeal Bd. (Mesich)*, 668 A.2d 249, 251 (Pa. Cmwlth. 1995).

In this case, Employer never issued a Notice of Compensation Payable (NCP) accepting liability for the injury in the first place, and Claimant never filed a claim petition for adjudication of the matter by a WCJ. Claimant does not address this discrepancy directly in his Brief but, rather, argues that Employer has already

---

[6] In relevant part, Section 315 of the Act provides that "any payment made under an established plan or policy of insurance for the payment of benefits on account of non-occupational illness or injury and which payment is identified as not being work[ers'] compensation shall not be considered to be payment in lieu of work[ers'] compensation." 77 P.S. § 602.

10

admitted liability through the issuance of e-time pay to Claimant. In support, Claimant alleges that Employer had notice of his work-related illness as early as October 13, 2020, when he notified his supervisor that he had tested positive for COVID-19 and gave the supervisor his opinion that the virus was contracted in the locker room. Claimant reasons that, pursuant to Section 406.1 of the Act,[7] Employer was thereupon required to file either an NCD, an NCP, or a Notice of Temporary Compensation Payable. Because it failed to do so in a timely manner yet continued to pay Claimant, he argues, Employer is estopped as a matter of law from denying benefits or disputing the work-relatedness of the injury.

In further support, Claimant refers to this Court's holding in *Mosgo v. Workmen's Compensation Appeal Board (Tri-Area Beverage, Incorporated)*, 480 A.2d 1285, 1290 (Pa. Cmwlth. 1988). In *Mosgo*, we held that an employer that compensates for a work injury but fails to issue a timely NCD "may not profit by [its] delinquency" by being permitted to disavow its acceptance of liability later on. In that case, a claimant salesman suffered a heart attack while delivering half-kegs of beer and was immediately taken off work. *Id.* at 1286. After receiving a report

---

[7] Added by the Act of February 8, 1972, P.L. 25, *as amended*, 77 P.S. § 717.1(a). In relevant part, Section 406.1(a) of the Act provides:

> The employer and insurer shall promptly investigate each injury reported or known to the employer and shall proceed promptly to commence the payment of compensation due either pursuant to an agreement upon the compensation payable or a notice of compensation payable as provided in [S]ection 407 [governing the time when agreements as to compensation or commutation of payments may be made] or pursuant to a notice of temporary compensation payable as set forth in subsection (d), on forms prescribed by the [Department of Labor and Industry] and furnished by the insurer. The first installment of compensation shall be paid not later than the [21st] day after the employer has notice or knowledge of the employe[e]'s disability.

77 P.S. § 717.1(a).

11

from the claimant's physician attributing the heart attack to the claimant's work duties, the employer's insurer began issuing workers' compensation benefits but did not file any documents pursuant to the Act. *Id.* The claimant filed a reinstatement petition after the insurer unilaterally ceased making those payments. A referee[8] denied the reinstatement petition on the ground that the claimant "failed to prove that the [employer] . . . wrongly terminated payments," and the Board affirmed. *Id.* at 1287. Reversing, this Court observed that the referee had improperly imposed on the claimant "the burden of proof for the continuation of benefits when a proper [NCP] would have put the burden to terminate payments upon the [e]mployer or its insurer." *Id.* at 1288. Likening this case to *Mosgo*, Claimant argues that there "is ample evidence in this record to establish that [Claimant] received wage loss benefits for over a year and that [Employer] clearly violated the Act by failing to file the NCD within 21 days of [Claimant] advising his supervisor . . . that he believed he got [COVID-19] in the locker room at work." Claimant's Br. at 20-21.

Claimant also cites a pair of more recent cases, *Kelly* and *Phillis*, in support of his position. In *Kelly*, a claimant construction worker was brutally assaulted by an unknown assailant. 669 A.2d at 1024. The employer, a sole proprietor, visited the claimant in the hospital the next day and, blaming a coworker of the claimant for the attack, pledged to compensate him for his injuries. *Id.* at 1025. After the claimant filed petitions seeking indemnity and disfigurement benefits, however, the employer disputed liability on the ground that the injuries occurred outside the scope of employment. *Id.* On appeal, this Court rejected that argument, holding that the cash payments to the claimant and the failure to file a NCD was "an admission of liability" that bound the employer just as though he had filed an NCP. *Id.* at 1027.

---

[8] At the time, WCJs were referred to as referees. *See* Section 401 of the Act, amended by the Act of July 2, 1993, P.L. 190, 77 P.S. § 701.

12

Claimant argues that, based on *Kelly*, "it is clear that the payments of wages to [Claimant], regardless of the label of [e]-time, made in the absence of a timely NCD were intended to compensate [Claimant] and served to acknowledge a work injury." Claimant's Br. at 22.

In *Phillis*, a claimant police officer was struck by a car while on his patrol motorcycle, and the employer's third-party administrator paid total disability benefits following the issuance of an NCP. 996 A.2d at 1113. The claimant returned to work, which caused the third-party administrator to suspend benefits, but began missing work again after exhibiting psychological disturbances that may or may not have resulted from the work injury. *Id.* The third-party administrator, disputing the theory that the psychological symptoms flowed from the work injury, twice issued NCDs. *Id.* at 1114-15. After the claimant exhausted his sick and vacation pay for those periods of missed work, however, the township itself continued paying his full salary "because [it] did not want to run afoul of any laws or violate [the c]laimant's civil rights." *Id.* at 1115. After discovering that the third-party administrator had ceased sending reimbursements, the township threatened litigation and the third-party administrator relented, issuing three checks of varying amounts to the township for medical and wage loss expenses. *Id.* at 1114. The claimant ultimately filed reinstatement and penalty petitions, which the third-party administrator resisted by arguing that the purpose of the reimbursements to the township was not to compensate the claimant for his disability. *Id.* at 1116-17. We agreed, observing: "All of the evidence shows that [the third-party administrator's] intent in sending checks to the [t]ownship . . . was *not* to compensate [the c]laimant for a work-related injury." *Id.* at 1118. In Claimant's view, *Phillis* stands for the proposition that payments are *not* in lieu of compensation when the following elements are met: (1)

13

"the employer issued two timely denials"; (2) "the payments were not directly made to the claimant"; (3) "the payments were not made in consistent or regular amounts"; and (4) they were "not made in a regular payment cycle." Claimant's Br. at 22. Since none of those elements are met in the instant matter, Claimant reasons, Employer "should be estopped from denying responsibility for [Claimant's] diagnosis and disability due to" COVID-19. *Id.* at 23.

Claimant's attempt to support his position by reference to these precedents is unavailing. In *Mosgo*, the insurer expressly stated that the payments were compensation for the claimant's injury, the work-relatedness of which was made obvious by the treating physician's written report. In *Kelly*, the claimant presented undisputed evidence that the employer had acknowledged the claimant's injuries to be work-related, and that the employer began issuing compensation for those injuries as a result. In *Phillis*, the insurer issued an NCP in response to an injury that had clearly occurred while the officer was in the line of duty. The details that Claimant garners from the *Phillis* fact pattern and casts as necessary elements to rebut a finding of payment in lieu of compensation are of minimal relevance to the question of the payor's "*intent* in making those payments," which we characterized in that case as "the critical legal element" in our inquiry. 996 A.2d at 1118 (emphasis in original).

In all three of the above cases, the entity responsible for payment of benefits accepted liability for injuries that were obviously work-related before they repudiated that liability on various grounds. Here, by contrast, the work-relatedness of the alleged injury was far from obvious, and Claimant's uncorroborated lay opinion that he contracted COVID-19 in the station locker room was and is insufficient to establish a work connection. Instead of offering unequivocal medical

14

testimony to establish the work connection, Claimant argues that the work connection is clearly established by Employer's notice of the alleged injury, its payment of Claimant's regular salary on an e-time basis, and its failure to file a timely NCD.[9]

This argument, too, is unpersuasive. Even if we deem Claimant to have raised the presumption of a work-related injury by reference to his receipt of e-time pay, it then falls to Employer to establish that those payments were issued pursuant to a plan for non-occupational injury or illness. Through testimony credited by WCJ San Angelo, Employer established that the e-time pay disbursed to Claimant was not compensation for a disability but an "administrative timekeeping category," employed to continue paying salaries and avoid the risk of unfairly penalizing workers. WCJ Decision, F.F., No. 3(e). Testimony by Lieutenant Lowenthal further established that e-time pay was used to prevent the spread of COVID-19, not to compensate for a purported loss of earning power. *See* Lowenthal Dep. at 14.

In arguing that the WCJ should have rejected Mr. Scott's and Lieutenant Lowenthal's testimony, Claimant essentially asks this Court to override WCJ San Angelo's credibility determinations. We decline to do so, as that function is performed by the WCJ in her role as "the ultimate finder of fact[] and the exclusive arbiter of credibility and evidentiary weight." *Lindemuth v. Workers' Comp. Appeal Bd. (Strishock Coal Co.)*, 134 A.3d 111, 125 (Pa. Cmwlth. 2016). We further note, however, that even Claimant's own testimony fails to establish that his e-time pay

---

[9] Claimant also argues that Employer's decision to issue e-time pay for more than a year before disbursing Act 17 benefits, which had been available since April 2020, further supports his assertion that the intent of the e-time pay was to provide payment in lieu of compensation. While it may be true that it would have been in Employer's best financial interest to transition Claimant and similarly situated employees to Act 17 benefits sooner than March 2022, we see no reason to assume that the failure to do so constitutes an admission that Claimant's alleged COVID-19 infection was work-related.

15

was compensation for a disabling injury. As WCJ San Angelo explained, Claimant offered no testimony to support the view that e-time pay was disbursed to compensate him for a work injury, and the DARs reflecting Claimant's pay status likewise provided nothing to support that view.

### B. Penalties

Finally, Claimant argues that Employer violated the Act when it failed to conduct a timely investigation of his injury and provide an adequate response, in violation of Section 406.1(a)'s instruction that an employer or insurer "shall promptly investigate each injury reported or known to the employer" and accept or deny liability within 21 days. 77 P.S. § 717.1(a). "Thus," Claimant explains, Employer "very clearly violated the Act." Claimant's Br. at 33.

Section 435(d)(i) of the Act[10] provides that, where a violation of the Act has occurred, the WCJ may assess a penalty not exceeding 10% of the amount awarded. 77 P.S. § 991. The assessment of penalties and their amount, if any, are discretionary, however. *Essroc Materials v. Workers' Comp. Appeal Bd. (Braho)*, 741 A.2d 820, 825 (Pa. Cmwlth. 1999). Even where it is apparent from the record that a violation of the Act has taken place, the imposition of a penalty is left to the WCJ's discretion, and the WCJ's decision in that regard will not be disturbed absent an abuse of discretion. *Id.* "An abuse of discretion is not merely an error of judgment but occurs, *inter alia*, when the law is misapplied in reaching a conclusion." *Westinghouse Elec. Corp. v. Workers' Comp. Appeal Bd. (Weaver)*, 823 A.2d 209, 213-14 (Pa. Cmwlth. 2003) (internal citations omitted). In light of the above, we disagree that WCJ San Angelo abused her discretion in denying Claimant's request for penalties, and we will not overturn her decision on appeal.

---

[10] Added by Act of February 8, 1972, P.L. 25.

## IV. Conclusion

Ultimately, our appellate role in a workers' compensation case is not to reweigh the evidence or the credibility of the witnesses, but simply to determine whether the WCJ's findings have the requisite measure of support in the record as a whole. *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 33 n.5 (Pa. Cmwlth. 2015). Claimant's evidentiary arguments are essentially an entreaty to make new credibility determinations on the question of Employer's intent in issuing e-time payments during his absence from work, which is not our role. WCJ San Angelo also properly exercised her discretion in declining to award penalties, a decision that also turns on her factual determinations. Discerning no error, we affirm the Board.


                                        _____

                                        MATTHEW S. WOLF, Judge


Judge Dumas did not participate in this decision.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Mark Tymes,
           Petitioner

       v.

City of Philadelphia (Workers'
Compensation Appeal Board),
           Respondent

:
:
:
:
:
:
:
:
:
:

No. 464 C.D. 2024

## **O R D E R**

AND NOW, this 29th day of January 2025, the order of the Workers' Compensation Appeal Board in the above-captioned matter, dated April 5, 2024, is hereby AFFIRMED.

_____
MATTHEW S. WOLF, Judge